# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Lynda Mae Flint,                                    **Civil No. 13-cv-1220 (PAM/SER)**

      Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

Carolyn Colvin,
Acting Commissioner of Social Security,

      Defendant.

---

Karl E. Osterhout, Esq., Osterhout Disability Law LLC, 521 Cedar Way, Suite 200, Oakmont, Pennsylvania 15139, for Plaintiff.

Edward C. Olson, Esq., 331 2nd Avenue South, Suite 420, Minneapolis, Minnesota 55401, for Plaintiff.

Ann M. Bildtsen, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Lynda Mae Flint ("Flint") seeks review of the Acting Commissioner of Social Security's ("Commissioner") denial of her application for Disability Insurance Benefits ("DIB"). *See* (Compl.) [Doc. No. 1]. The parties filed cross-motions for summary judgment ("Flint's Mot. for Summary J." and "Commissioner's Mot. for Summary J.," respectively) [Doc. Nos. 15, 24] that have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Flint's Motion for Summary Judgment be denied and the Commissioner's Motion for Summary Judgment be granted.

## I.      BACKGROUND

### A.      Procedural History

Flint filed her application for DIB on May 17, 2010.  (Admin. R.) [Doc. No. 11 at 71–72].  Flint listed an alleged onset date ("AOD") of December 31, 2009, and claimed disability due to fibromyalgia and affective/mood disorders.[1]  (*Id*.).  Flint's claims were denied initially on October 27, 2010, and again upon reconsideration on January 13, 2011.  (*Id*. at 72–74).  Administrative Law Judge Joseph R. Doyle (the "ALJ") heard the matter on March 7, 2012.  (*Id*. at 29–70, 89–90).  The ALJ issued an unfavorable decision on May 3, 2012, and determined Flint was not disabled.  (*Id*. at 9–28).  Flint requested review of the ALJ's decision by the Appeals Council on May 3, 2012.  (*Id*. at 1).  The Appeals Council denied Flint's request for review, rendering the ALJ's decision final.  (*Id*. at 1–4); *see* 20 C.F.R. § 404.981.

### B.      Flint's Background and Testimony

At the AOD, Flint was 50 years old, making her an individual closely approaching advanced age.  (Admin. R. at 22, 71–72).  She has a high school education and previously worked as a housekeeping cleaner, assembler, wreath maker, and cook.  (*Id*. at 22, 33, 36, 38–42, 63).  Flint believed she was incapable of performing any of her previous jobs.  (*Id*. at 42).

She testified that she could stand for five to ten minutes at a time doing the dishes, could put in a load of laundry but needed help transferring the clothes to the dryer, and cooked easier

---

[1]      Fibromyalgia is

A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least 11 of 18 specified sites.

*Stedman's Medical Dictionary*, Fibromyalgia (27th Ed. 2000).

meals, but could not do any exterior maintenance. (*Id*. at 35–36, 59–60). Flint testified that she can go by herself to her clinic appointments, goes to the grocery store with her boyfriend sometimes, and enjoys gardening in her rock garden. (*Id*. at 49, 54–57). She also testified that because she had no concentration, she no longer read, wrote, or handled paying the bills and only skimmed the newspaper. (*Id*. at 36–38).

Flint experienced pain in her legs, back, right shoulder, and hands; fibromyalgia; anxiety; and difficulty concentrating. (*Id*. at 34, 43–51). Flint tried various treatments for her conditions. (*Id*. at 43–56). Flint explained that her conditions had worsened in the previous year. (*Id*. at 57–61).

### C.    Relevant Medical Record Evidence

Certain records in the Administrative Record concern impairments and illnesses that neither of the parties nor the ALJ base their analysis on, and that the Court does not find relevant—such medical records will not be summarized.

### 1.    Before December 31, 2009

Andrew Chiu, M.D. ("Dr. Chiu") saw Flint for chest pain on July 26, 2000. (*Id*. at 253). He ordered a Doppler echocardiogram, which came back normal and unremarkable.[2] (*Id*. at 254).

John Holcomb, M.D. ("Dr. Holcomb") saw Flint on January 2, 2009. (*Id*. at 285). Dr. Holcomb noted that Flint was diagnosed with hypothyroidism; had diffuse myalgias untreatable with ibuprofen and Tylenol; had joint pain; was a smoker; and did not suffer from symptoms of

---

[2]    Doppler echocardiography means "use of Doppler ultrasonography techniques to augment two-dimensional echocardiography . . . ." *Stedman's Medical Dictionary*, Echocardiography (27th Ed. 2000). Echocardiography means "ultrasound in the investigation of the heart and great vessels used to diagnose cardiovascular lesions." *Id.*

depression.[3]  (*Id.*).   On February 9, 2009, Flint returned complaining of daily myalgias and depression.  (*Id.* at 283).   Dr. Holcomb commented that Flint's depression symptoms included "feeling sad, low energy, insomnia, feeling overwhelmed, not enjoying the things [she] used to enjoy, trouble concentrating and low self-esteem, [and] not wanting to go out of the house." (*Id.*).   Dr. Holcomb prescribed venlafaxine.[4]  (*Id.* at 284).

On July 14, 2009, Flint was seen by Kendra Sharkey, R.N., C.N.P. ("Sharkey") for hypertension.   (*Id.* at 281).   Sharkey stated that Flint's "blood pressure is inadequately controlled" but the she "takes medications as prescribed."  (*Id.*).   Sharkey also noted that Flint was a smoker who was not interested in taking Chantix.[5]  (*Id.*).   Flint was seen by Sharkey again on August 11, 2009, to get her blood pressure checked.   (*Id.* at 279).   Flint's goal was to stop smoking by the end of the year.   (*Id.* at 279–80).

On July 21, 2009, Flint was again seen by Dr. Chiu for hypertension and testing showed normal findings.[6]  (*Id.* at 255–56).

On December 8, 2009, Flint was seen by Sharkey and had many concerns.   (*Id.* at 276).

---

[3]       Myalgia means "muscular pain."  *Stedman's Medical Dictionary*, Myaliga (27th Ed. 2000).

         Hypothyroidism means "[d]iminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, somnolence and sometimes myxedema."  *Stedman's Medical Dictionary*, Hypothyroidism (27th Ed. 2000).

[4]       Venlafaxine is a generic name for Effexor, which is "used to treat depression, . . . general anxiety disorder (GAD), social anxiety disorder (SAD), and panic disorder."  *Venlafaxine (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

[5]       Chantix is a brand name for varenicline, which is "used together with a support program to help you stop smoking."  *Varenicline (Oral Route), Description and Brand Names*, Mayo Clinic (Nov. 1, 2013), http://www.mayoclinic.org/drugs-supplements/varenicline-oral-route/description/drg-20068324.

[6]       Hypertension is "[h]igh blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences."  *Stedman's Medical Dictionary*, Hypertension (27th Ed. 2000).

Flint wanted to stop smoking, but was unsure of the best method.  (*Id.*).  Sharkey prescribed nicotine patches.  (*Id.* at 277).  Flint mentioned that her depression was controlled at the time, but she still experienced muscle pain, tiredness, and was not feeling well.  (*Id.* at 276).

### 2.    After December 31, 2009

On February 10, 2010, Flint complained of headaches and groin pain, and was seen by Courtney Hoy, R.N., C.N.P. ("Hoy").  (*Id.* at 272).  Hoy recommended a low salt diet to treat her hypertension.  (*Id.* at 274).  Hoy mentioned the pain could be due to a strain and ordered an x-ray of Flint's left groin. (*Id.*).  The hip images were normal.  (*Id.* at 292–93).

On February 25, 2010, Flint presented to Dr. Holcomb for a follow up for fibromyalgia.  (*Id.* at 271).  She stated these symptoms were not worsening since starting simvastatin.[7]  (*Id.*).  When Flint acknowledged that she was depressed, Dr. Holcomb noted that when he attempted to start her on venlafaxine to treat her depression last year she demurred, but she was now willing to try it.  (*Id.* at 271–72).

On April 9, 2010, Flint presented for a follow up evaluation for dysthymia and for medication management with Dr. Holcomb.[8]  (*Id.* at 267).  Flint had "been taking nothing because she got nauseated and dizzy from the venlafaxine."  (*Id.*).  Dr. Holcomb specifically noted that Flint had stopped working three weeks ago due to fibromyalgia.  (*Id.* at 267–68).

On June 15, 2010, Flint presented to an emergency room complaining of neck pain.  (*Id.* at 249).  The examining physician diagnosed Flint as having muscle spasms and discharged her.

---

[7]    Simvastatin is "[a] potent HMG-CoA reductase (the rate-limiting enzyme for cholesterol biosynthesis) inhibitor.  Used for the treatment of hyperlipidemia . . . ."  *Stedman's Medical Dictionary*, Simvastatin (27th Ed. 2000).

[8]    Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness."  *Stedman's Medical Dictionary*, Dysthymia (27th Ed. 2000).

(*Id.* at 250).   Three days later, Flint followed up with Campbell.   (*Id.* at 263).   Campbell encouraged Flint to get out and walk and generally move more, and noted that her blood pressure was controlled poorly.  (*Id.* at 264).   When Campbell encouraged smoking cessation, Flint asked for a referral to the QuitPlan program, which Campbell provided.  (*Id.*).

On July 8, 2010, Dr. Holcomb commented that Flint was starting the QuitPlan for smoking the following week and wanted to see a psychiatrist for her depression and fibromyalgia.  (*Id.* at 262).   On October 14, 2010, Flint was seen by Dr. Holcomb for neck and right shoulder pain.  (*Id.* at 347–48).   Dr. Holcomb commented that

> [Flint] is not taking a lot of her medications that I ordered [and she] wants to go to the Pain Clinic but she is not cooperative enough on following thru [sic] with appointments.  She missed one with me this past month.  She needs to be more diligent or it will be a waste of time.

(*Id.* at 348).

Flint began regularly participating in outpatient psychological services with Dr. Nicole Fleming, Psy.D., L.P. ("Dr. Fleming") in August 2010.  (*Id.* at 408).   During Flint's many visits to Dr. Fleming, they discussed Flint's achievements and struggles, practiced calming techniques, and discussed Flint's future worries and how she might address them.  (*Id.* at 337–47, 455–58, 468).   Flint made progress in how she managed her mental impairments throughout her time with Dr. Fleming.  *See* (*id.*).

On December 15, 2010, Dr. Fleming noted that Flint "demonstrated remarkable improvement . . . [and] good progress."  (*Id.* at 482–83).   Dr. Fleming mentioned that Flint complied with treatment recommendations.  (*Id.*).

Flint also mentioned that she started Cymbalta and had noticed mood improvement.[9] (*Id.*). Dr. Fleming noted that Flint had "hopes to find employment upon successful completion of the pain program and a better ability to manage pain." (*Id.*). Despite her improvements, Flint still struggled. *See, e.g.*, (*id.* at 432, 473, 479).

On June 8, 2011, Flint saw Dr. Fleming and explained she was doing better mentally but had remaining physical concerns, especially her shoulder. (*Id.* at 412–13). Dr. Fleming performed a re-evaluation on June 18, 2011, to assess what goals had been met after fourteen psychotherapy sessions. (*Id.* at 408). Several of Flint's short-term and long-term goals had been met, and Dr. Fleming opined Flint had made "excellent progress with her ability to better self manage pain and associated anxiety and depression." (*Id.* at 409). Dr. Fleming saw Flint a few more times before Flint requested her treatment be put on hold until Dr. Fleming's return from maternity leave.[10] (*Id.* at 393). Dr. Fleming noted that at Flint's last visit on July 20, 2011, she reported improvement in "physical activity, mood, and sleep," but "continu[ed] to work on her anxiety. (*Id.* at 397).

Concurrently with her treatment with Dr. Fleming, Flint was accepted into the Essentia Health Pain Management Program ("PMP") on December 31, 2010.[11] (*Id.* at 476–81). Flint's primary providers while in the PMP were Rachel Scharfenberg, R.N., C.N.P. ("Scharfenberg"), Dr. Fleming, Melanie Neveau, O.T. ("Neveau"), and Sharon O'Conner, P.T. ("O'Conner"). *See* (*id.* at 462, 464, 476–81).

---

[9]     Cymbalta is the brand name for duloxetine, which "is used to treat depression and anxiety." *Duloxetine (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247.

[10]     Dr. Fleming's maternity leave was from August 2011, until October 2011. (Admin. R. at 413).

[11]     The PMP is "a moderately intensive outpatient multidisciplinary rehabilitation program of 16 week duration . . . [Flint] is an excellent candidate for the pain management program and will benefit from the treatment modalities offered here." (*Id.* at 480).

On December 31, 2010, Scharfenberg performed a comprehensive consultation to assess Flint's current functional ability, medical, social, treatment history, mental health issues, and physical ailments. (*Id.* at 476–81). Scharfenberg noted that Flint suffered from significant depression, but Flint felt that Dr. Fleming's treatments had been beneficial and that her symptoms improved every time they met. (*Id.* at 479). Scharfenberg examined Flint and found high blood pressure, fibromyalgia, depression, anxiety, and a shoulder sprain. (*Id.* at 480–81). Scharfenberg commented that Flint had a social phobia and history of panic attacks that contributed to her poor treatment compliance in the past. (*Id.* at 480). Scharfenberg noted that "[Flint] will need to commit to a moderately intensive 16 week program in order to be successful." (*Id.*). Scharfenberg recommended Flint try Cymbalta and Lyrica for depression and pain relief.[12] (*Id.* at 481).

On January 18, 2011, Neveau and O'Conner separately evaluated Flint. (*Id.* at 462, 464). Neveau recommended Flint for occupational therapy as part of the PMP and O'Conner recommended physical therapy as part of the PMP. (*Id.* at 463, 466–67).

During the sixteen-week PMP, Flint saw progress in her conditions and was largely compliant with treatment. (*Id.* at 410–30, 436–39, 442–48, 457–67). For example, Flint reported she was "just a little depressed;" Flint was also able to leave the house more and do more activities including: cooking, vacuuming, dusting, laundry with assistance, dishes, television, Facebook, computer games, walking the house, stair-walking, increased daily activity, and visiting a fitness center regularly. *See, e.g.*, (*id.* at 426, 428, 459). Flint also reported she was taking Cymbalta which helped with body sensitivity. (*Id.* at 436, 447).

---

[12]     Lyrica is the brand name for pregabalin, which "works in the central nervous system (CNS) to control seizures and pain." *Pregabalin (Oral Route), Description and Brand Names*, Mayo Clinic (Dec. 1, 2013), http://www.mayoclinic.org/drugs-supplements/pregabalin-oral-route/description/drg-20067411.

Throughout the PMP, Flint reported that she continued to have pain in her right shoulder. (*Id.* at 404, 410–13). Flint's was diagnosed with a shoulder sprain years ago and was treated with physical therapy, but she dropped out of that therapy program early. (*Id.* at 404). Scharfenberg ordered an x-ray but suspected that the pain was more myofascial and related to abnormal musculature.[13] (*Id.* at 405).

On June 22, 2011, O'Conner discharged Flint after eighteen visits, no cancellations, and no no-shows with all goals except one met.[14] (*Id.* at 403–04). On the same day, Neveau also discharged Flint after seven visits, with one cancellation and no no-shows; Flint had good home compliance and met all her goals from the initial evaluation. (*Id.* at 406).

Flint visited Scharfenberg on July 6, 2011, which was during the PMP. (*Id.* at 401). Scharfenberg noted that Flint attended most sessions and had achieved her pain management goals.[15] (*Id.*). Flint reported to Scharfenberg "that her fibromyalgia symptoms have improved" and "her mood and depression symptoms have improved significantly." (*Id.*). Scharfenberg ordered additional physical therapy sessions for her shoulder specifically and explained that the x-ray of her shoulder revealed mild degenerative changes in the joint. (*Id.*).

On July 18, 2011, Flint presented to O'Conner outside of the PMP for complaints of right shoulder pain. (*Id.* at 398). Flint explained that her shoulder symptoms began during and because of the PMP exercise, and that her current symptoms were not improving. (*Id.* at 398–99). O'Conner prescribed biweekly visits for six to eight weeks. (*Id.* at 400). On July 25, 2011, however, O'Conner discharged Flint because her attendance and participation were not sufficient

---

[13]     Myofascial pain is pain "[o]f or relating to the fascia surrounding and separating muscle tissue." *Stedman's Medical Dictionary*, Myofascial (27th Ed. 2000).

[14]     O'Conner's discharge note stated that "all goals met with the exception of STG 2." (Admin. R. at 404). However, "STG 2" is not defined. *See* (*id.*).

[15]     Scharfenberg noted that Flint "missed a couple of appointments due to illness and . . . outside activities." (*Id.* at 402).

and she did not return to physical therapy.  (*Id.* at 396).

On August 1, 2011, Flint presented to Dr. Hind Tabit, M.D. ("Dr. Tabit") to establish primary care.  (*Id.* at 393).  Dr. Tabit noted that Flint had hypertension and depression, both of which were uncontrolled; also she was "not compliant with a program of diet and exercise" and had stopped taking Cymbalta.  (*Id.*).  Dr. Tabit altered Flint's prescriptions.  (*Id.* at 395).  By Flint's next visit with Dr. Tabit on August 16, 2011, her hypertension and depression were stable.  (*Id.* at 386–87).

On August 10, 2011, Shannon Swanson, R.N. ("Swanson") examined Flint pursuant to a depression management program.  (*Id.* at 390).  Flint reported that she was afraid she would die if she took Prozac so she did not start this medicine, that she took Cymbalta on rare occasion but understood the importance of taking the medication regularly for it to work effectively.[16]  (*Id.* at 392).  At her follow-up appointment on August 16, 2011, Flint still had not started Prozac but planned to start.  (*Id.* at 386).  On September 6, 2011, Flint missed her scheduled appointment with Swanson.  (*Id.* at 384).

On September 9, 2011, Flint presented to Dr. Priscilla Knighton, M.D. ("Dr. Knighton") complaining of stiffness in her neck, and requesting a refill of Flexeril prescription.[17]  (*Id.* at

---

[16]   Prozac is a brand name of fluoxetine, which "is used to treat depression, obsessive-compulsive disorder (OCD), . . . and panic disorder."  *Fluoxetine (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952.

[17]   Flexeril is the brand name for cyclobenzaprine, which "is used to help relax certain muscles in your body. It helps relieve the pain, stiffness, and discomfort caused by strains, sprains, or injuries to your muscles."  *Cyclobenzaprine (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/cyclobenzaprine-oral-route/description/drg-20063236.

381).  Dr. Knighton referred Flint to physical therapy and refilled Flexeril and tramadol.[18]  (*Id.* at 382).

At Flint's next appointment with Swanson as part of the depression management program on September 22, 2011, she had started Prozac and was feeling "overall much improved."  (*Id.* at 383).  Swanson also noted that Flint said she was "certain when her pain is better managed, her symptoms of depression will be greatly reduced."  (*Id.*).  After this positive progress, however, Flint failed to show up for her next two appointments and failed to reschedule.  (*Id.* at 377, 380–81).  Due to her lack of contact with the program for two months, Flint was inactivated from the depression management program on December 2, 2012.  (*Id.* at 376).

On December 20, 2011, Flint was examined by Andrea Winans, P.T. ("Winans"), who noted that Flint reported her neck and shoulder pain was from a work incident in 2009 and made worse by a strengthening exercise during the PMP.  (*Id.* at 369–70).  Winans noted that an x-ray came back negative for any tears or symptoms.  (*Id.* at 370).  To treat Flint's symptoms, Winans prescribed four to eight weeks of therapeutic exercise and a home strength-training program.  (*Id.* at 371–72).  Flint's next appointment with Winans was on December 23, 2011, where she reported doing well after the first session with less shoulder pain.  (*Id.* at 368).  On December 27, 2011, Flint followed up and reported that the prescribed therapy was helping, but due to an increase in family stressors, she had increased upper trapezius tension and neck pain.  (*Id.* at 367).  At Flint's January 4, 2012 appointment, she reported that she was doing better overall and was completing her home program, but was having difficulties with pain.  (*Id.* at 366).

On January 30, 2012, Flint presented to Dr. Tabit with complaints of sore and weak

---

[18]      Tramadol "is used to relieve moderate to moderately severe pain . . . ."  *Tramadol (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050.

hands. (*Id.* at 363). Dr. Tabit referred Flint to Orthopedics and increased her Prozac dosage. (*Id.* at 365). A January 31, 2012 orthopedic examination returned no positive findings and Flint was diagnosed with bilateral carpal tunnel.[19] (*Id.* at 514–17). Flint returned the orthopedic department in February 2012, with persisting carpal tunnel symptoms and steroid injections were administered. (*Id.* at 518).

When Flint visited Dr. Tabit on February 13, 2012, for a follow-up of her depressive disorder, Flint reported that she did not feel good on Prozac so she stopped taking it. (*Id.* at 524). Dr. Tabit started Flint on Celexa.[20] (*Id.* at 525).

At Flint's follow-up appointment with Dr. Tabit on March 6, 2012, she complained her depression was not improving since her last visit and her chronic pain was not improving on tramadol. (*Id.* at 526). Dr. Tabit increased her Celexa dosage, discontinued tramadol, and started Flint on Lyrica for chronic pain. (*Id.* at 528). Flint's symptoms were improved at her March 20, 2012 visit. (*Id.* at 529). When Flint returned on April 24, 2012, for a complete physical examination, she reported that she did not take her prescribed Celexa or the Lyrica. (*Id.* at 540).

Flint presented to Richard Crowell, P.T. ("Crowell") for her right upper back pain on April 18, 2012. (*Id.* at 531). Flint reported that the pain was ongoing for one year and that while she had therapy before, it was only helpful for one to two hours after treatment. (*Id.*). Flint also commented that her neck pain inhibited her ability to work and that Flexeril was only of minimal

---

[19]    Carpal tunnel syndrome "the most common nerve entrapment syndrome, characterized by nocturnal hand paresthesia and pain, and sometimes sensory loss and wasting in the median hand distribution; affects women more than men and is often bilateral; caused by chronic entrapment of the median nerve at the wrist, within the carpal tunnel." *Stedman's Medical Dictionary*, Syndrome (27th Ed. 2000).

[20]    Celexa is the brand name for citalopram, which "is used to treat depression." *Citalopram (Oral Route), Description and Brand Names*, Mayo Clinic (Feb. 1, 2014), http://www.mayoclinic.org/drugs-supplements/citalopram-oral-route/description/drg-20062980.

help.  (*Id.*).

On April 23, 2012, Flint presented for a psychological evaluation by Marian Flammang, Ph.D. ("Dr. Flammang").  (*Id.* at 534).  Dr. Flammang mentioned, "[i]t is interesting to note that although Ms. Flint requested antidepressant medication from Dr. Tabit, she has not taken the medicine due to what she realizes is an irrational fear of thinking that 'my heart will stop' if she takes her Celexa medication."  (*Id.* at 536).  She then says that "[i]t is difficult to diagnosis [sic] Ms. Flint's chronic symptoms of depression and anxiety, . . . [but that] she is likely to meet [objective] criteria for the following diagnoses: major depressive disorder, recurrent, severe without psychotic features; social phobia; obsessive-compulsive disorder; avoidant personality disorder; and dependent personality disorder."  (*Id.* at 538).  Dr. Flammang recommended that Flint contact the Adult Partial Hospitalization Program ("AHP") and "pointed out that her [psychological] symptoms seem to be impairing her ability to follow doctor's recommendations and seek more consistent psychotherapeutic help."  (*Id.* at 539).

Flint presented to Crowell again on April 25, 2012, and reported no change in pain.  (*Id.* at 547).  Crowell did note that Flint experienced a 50% reduction in pain with applied electrical stimulation, and instructed Flint on home use of electrical stimulation.  (*Id.*).

On May 16, 2012, Flint again presented to Dr. Tabit for a follow-up of her chronic pain. (*Id.* at 548).  Dr. Tabit stated that Flint had not started the Lyrica yet and started taking Celexa seven days prior.  (*Id.*).  Dr. Tabit recommended Flint continue Celexa and start Lyrica.  (*Id.* at 550).

Flint underwent a brief assessment, performed by Katie Onofreychuk, L.S.W. ("Onofreychuk") for the AHP on May 21, 2012.  (*Id.* at 551).  Flint's first visit as a part of the AHP was on May 31, 2012, where she reported her biggest stressors were "her physical and

mental health issues and a [sic] alcoholic son." (*Id.* at 556). Flint also reported that "[h]er current psychiatric medication is Celexa 40mg daily but she hasn't started it yet because she is afraid to [and s]he hasn't started her Lyrica yet either because of her fears." (*Id.*).

Throughout her subsequent visits, Flint still had not started taking her prescribed medications. (*Id.* at 558–65). Flint reported she was going to start taking her medications and go to a weight loss counselor. (*Id.*). Onofreychuk and the AHP nurses noted that Flint participated well but reluctantly, and had eventually started taking her medications, but with some reports of heaviness in her head, which was scaring her. (*Id.* at 562, 564). Flint was discharged from the AHP on June 26, 2012, and reported that she was going to start seeing Dr. Fleming again. (*Id.* at 573). Flint also self-reported that her anxiety greatly improved, she had started taking her medications regularly, and was utilizing techniques to decrease her anxiety. (*Id.*).

### 3. Consultative Examinations[21]

#### a. Physical Consultative Examination

On October 15, 2010, Dr. Neil Johnson, M.D. ("Dr. Johnson") conducted a physical examination of Flint. (*Id.* at 307–14). After going through Flint's family and medical history, Dr. Johnson performed a physical and neurological examination and concluded that Flint's motor and sensory functions remained intact; her reflexes were symmetrical; noted no disorientation;

---

[21] A consultative examination is performed

> If [the claimant's] medical sources can[ ]not or will not give [the SSA] sufficient medical evidence about [the claimant's] impairment for [the SSA] to determine whether [the claimant is] disabled or blind, [the SSA] may ask [the claimant] to have one or more physical or mental examinations or tests. [The SSA] will pay for these examinations. However, [the SSA] will not pay for any medical examination arranged by [claimant or the claimant's] representative without [the SSA's] advance approval.

20 C.F.R. § 416.917.

and diagnosed her with fibromyalgia, hypertension, and hypothyroidism. (*Id.* at 310). Dr. Johnson also noted Flint had significant pain and tenderness in trigger spots. (*Id.* at 308, 310).

### b. Mental Consultative Examination

State Agency consultant Dr. Marlin Trulsen, Ph.D. ("Dr. Trulsen") examined Flint's mental status on August 31, 2010. (*Id.* at 301–06). Dr. Trulsen concluded:

> Ms. Flint's general mental capacity for understanding, remembering, and following instructions, sustaining attention, and concentrating all appeared adequately developed and showed no general impairment. Her general mental capacity for carrying out work-like tasks with reasonable persistence or pace, respond appropriately to brief and superficial contact with coworkers and supervisor, as well as tolerate stress and pressures typically found in an entry-level workplace may demonstrate occasions of slight impairment per her current report of mental health symptoms, however, this would not appear to prevent her from being effective in applying her skills in these areas. This is suggested by her general daily activities and completion of responsibilities as well as her previous employment history, which she indicated ended due to physical difficulties as opposed to mental health concerns. She appears capable of respecting authority to an average level. Gait and station were observed as average with no difficulty negotiating stairs, sitting, walking, or standing. She demonstrated an average ability to hear and produce normal conversations and sustain speech.

(*Id.* at 305).

### 4. State Agency Medical Consultants' Opinions

Due to Flint's physical and mental impairments, State Agency consultants assessed Flint's Physical Residual Functional Capacity ("RFC") and Mental RFC.

### a. Physical RFC Assessment

On October 27, 2010, State Agency consultant Dr. Charles Grant, M.D. ("Dr. Grant") completed a physical RFC assessment. (*Id.* at 329–36). After reviewing Flint's medical file, Dr. Grant opined that Flint could occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, could stand or walk with normal breaks for about six hours in an eight hour work day, could sit with normal breaks for about six hours in an eight hour work day, and could

push or pull an unlimited amount of weight. (*Id.* at 330). Dr. Grant opined that Flint had no physical limitations besides her pain. (*Id.*). Dr. Grant noted that Flint had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 331–33).

At the reconsideration level on January 13, 2011, State Agency consultant Dr. Steven Richards, M.D. ("Dr. Richards") reviewed the updated medical evidence record. (*Id.* at 359–61). Dr. Richards noted that the updated record, however, "fail[ed] to establish significant worsening of symptoms and functioning." (*Id.* at 360). As such, Dr. Richards affirmed Dr. Grant's RFC. (*Id.*).

### b.    Mental RFC Assessment

On October 27, 2010, State Agency consultant Dr. Owen Nelsen, Ph.D. ("Dr. Nelsen") reviewed the medical record and completed a psychiatric review technique ("PRT").[22]  (*Id.* at 315–28).

In the PRT, Dr. Nelsen opined that Flint had medically determinable impairments that were not severe, based on an analysis of Listing 12.04 Affective Disorders, for her chronic adjustment disorder with mixed anxiety and depressed mood; Listing 12.06 anxiety-related

---

[22]          The Psychiatric Review Technique is described in 20 C.F.R. 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) [it] requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

*Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P, 1996 WL 374184, at *4 (July 2, 1996).

disorders, for her panic disorder with agoraphobia; and Listing 12.09 substance addiction

disorders, for her "[b]ehavioral changes or physical changes associated with the regular use of

substances that affect the central nervous system."[23]  (*Id.* at 315–23).

Dr. Nelsen found mild restriction of activities of daily living; mild difficulties in

maintaining social functioning; mild difficulties in maintaining concentration, persistence, or

pace; and no episodes of decompensation of extended duration.  (*Id.* at 325).  Dr. Nelsen opined

that the evidence did not establish the presence of the "paragraph C" criteria. (*Id.* at 326).

Dr. Nelsen gave Flint a Global Assessment Functioning ("GAF") of 55 and concluded the

following:

> Flint's general mental capacity for understanding, remembering, and following
> instructions, sustaining attention, and concentrating all appeared adequately
> developed and showed no general impairment.  Her general mental capacity for
> carrying out work-like tasks with reasonable persistence or pace, respond
> appropriately to brief and superficial contact with coworkers and supervisor, as
> well as tolerate stress and pressures typically found in an entry-level workplace
> may demonstrate occasions of slight impairment per her current report of mental
> health symptoms, however, this would not appear to prevent her from being
> effective in applying her skills in these areas—This is suggested by her general
> daily activities and completion of responsibilities as well as her previous
> employment history, which she indicated ended [due] to physical difficulties as
> opposed to mental health concerns—She appears capable of respecting authority
> to an average level.  Gait and station were observed as average with no difficulty
> negotiating stairs, sitting, walking, or standing—She demonstrated an average
> ability to hear and produce normal conversation and sustain speech.

(*Id.* at 327).

At the reconsideration level on January 12, 2011, State Agency consultant Dr. Russell

Ludeke, Ph.D. ("Dr. Ludeke") reviewed the updated medical evidence record.  (*Id.* at 355–57).

Dr. Ludeke noted that the updated record "fail[ed] to establish significant worsening of

---

[23]     Agoraphobia is "[a] mental disorder characterized by an irrational fear of leaving the
familiar setting of home, or venturing into the open, so pervasive that a large number of external
life situations are entered into reluctantly or are avoided; often associated with panic attacks."
*Stedman's Medical Dictionary*, Agoraphobia (27th Ed. 2000).

symptoms and functioning."  (*Id.* at 356).  As such, Dr. Ludeke affirmed Dr. Nelsen's evaluation.

(*Id.*).

### D.     Vocational Expert Testimony

Edward Utities testified as a vocational expert ("VE") at the hearing before the ALJ.  *See,*

*e.g.*, (*id.* at 31).  He holds a B.S. degree in from Northland College and a M.S. degree in

Counseling from University of Wisconsin.  (*Id.* at 133).  He identified Flint's past employment

as an assembler, which is listed as a light and unskilled occupation; a housekeeping cleaner,

which is listed as light and unskilled but was performed as medium; a wreath maker, which is

listed as light, unskilled work and was seasonal in nature; and a cook, which is medium and

skilled work but was performed semi-skilled.  (*Id.* at 63).  The ALJ asked the VE the following

hypothetical question:

> Please assume an individual who was capable of performing light work.  This
> hypothetical individual could occasionally engage in overhead reaching with the
> right [upper] extremity . . . and . . . frequently engage in gross and fine
> manipulation with the right upper extremity.  The hypothetical individual would
> be limited to simple, routine, and repetitive tasks which require only occasional
> interaction with the public and only occasional interaction with co-workers.
> Considering this first hypothetical, would the hypothetical individual be capable
> of performing any of the past work that you identified?

(*Id.* at 64–65).  The VE answered that the hypothetical individual would be able to perform the

job of a housekeeping cleaner, an assembler, and a wreath maker because all of those positions

are listed as light and unskilled jobs that are simple and routine.  (*Id.* at 65–66).

The ALJ then asked whether there would be any other jobs the hypothetical individual

could perform and considering Flint's age, education, and experience.  (*Id.* at 66).  The VE

answered yes, and identified three jobs: a packaging machine operator, a bander and cellophaner,

and a wrapping machine operator.  (*Id.*).

The ALJ then asked a second hypothetical question: "Please assume the same limitations

as hypothetical one.  However, the hypothetical individual would miss three or more days of work per month on an unexcused or unscheduled basis.  Considering this hypothetical, would there be any competitive work, in your opinion?"  (*Id.* at 67).  The VE responded that he did not think there would be any because this level of absence was beyond the normal amount allowed.  (*Id.*).  The ALJ asked what the tolerance in the workplace would be for off-task behavior in addition to regularly scheduled breaks, and the VE responded that a person being off-task for more than 10 percent of the time would not be tolerated by most employers.  (*Id.*).

Then, the ALJ asked a third hypothetical question: "Please assume the same limitations as hypothetical one.  In addition, the hypothetical individual would be off-task 15 percent or more of the work day, in addition to regularly scheduled breaks.  Considering this hypothetical, would there be any competitive work?"  (*Id.* at 67–68).  The VE responded no.  (*Id.* at 68).

On examination by Flint's attorney, the VE was asked, "assuming hypothetical number one with the additional limitation of [occasional] handling and fingering, would . . . that hypothetical allow for past work?"  (*Id.* at 68–69).  The VE responded that those positions would be eliminated, as would other jobs in the national economy.  (*Id.* at 69).

**E.     The ALJ's Decision**

On May 3, 2012, the ALJ issued a decision finding Flint was not disabled.  (*Id.* at 9–11).  The ALJ reached his conclusion after evaluating this case based on the five-step process.  *See* 20 C.F.R. 404.1520(a), 416.920(a).   The ALJ considered: (1) whether Flint was engaged in substantial gainful activity; (2) whether Flint had a severe medically determinable impairment or a severe combination of impairments; (3) whether Flint's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"); (4) whether Flint could return to her past work; and (5) whether

Flint could do any other work in light of her residual functional capacity, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g); (Admin. R. at 13 – 14).

At the first step, the ALJ found that Flint had not engaged in substantial gainful activity since the AOD. (*Id*. at 14). The ALJ noted that Flint worked after the AOD, but due to the lack of information about the hours and earnings of this work, the ALJ gave Flint the benefit of the doubt, and found no substantial gainful activity. (*Id*.).

At the second step, the ALJ found that Flint had the following severe impairments: fibromyalgia, obesity, hypertension, degenerative joint disease of the right shoulder, depression, and anxiety. (*Id*. at 15).

At step three, the ALJ determined Flint did not have an impairment or combination of impairments that met or medically equaled one of the Listings. (*Id*.). The ALJ noted that Flint's degenerative joint disease of the right shoulder did not meet or medically equal Listing 1.02. (*Id*.). Although fibromyalgia and chronic fatigue syndrome were not included in the Listings, the ALJ considered Listing 1.00, musculoskeletal system impairments and Listing 12.06, anxiety related disorders. (*Id*.). The ALJ similarly found that Flint did not meet or medically equal the required criteria for these Listings. (*Id*.).

The ALJ considered Flint's mental impairments, singly and in combination, but found that these impairments did not meet or medically equal the criteria of Listing 12.04 or 12.06.[24] (*Id*. at 16). In making this determination, the ALJ explained that he considered whether the "Paragraph B" requirements were satisfied.[25] (*Id*.). To meet "Paragraph B" requirements, a

---

[24]     Section 12 lists mental disorders in nine diagnostic categories. 20 C.F.R. 404, Subpt. P, App. 1, § 12.00(A). Section 12.04 applies to affective disorders and Section 12.06 applies to anxiety related disorders. *Id.*

[25]          The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the

mental impairment must cause at least two of the following: (1) marked restriction of daily living activities; (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[26] (*Id.*).

Flint had a moderate restriction in her activities of daily living because Flint "ha[d] some difficulty effectively engaging in activities of daily living without assistance."[27] (*Id.* at 16). The

_____

degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months. . . . Each listing, except 12.05 and 12.09, consists of a statement describing the disorder(s) addressed by the listing, paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations). There are additional functional criteria (paragraph C criteria) in 12.02, 12.03, 12.04, and 12.06, discussed herein. We will assess the paragraph B criteria before we apply the paragraph C criteria. We will assess the paragraph C criteria only if we find that the paragraph B criteria are not satisfied. We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.

. . .

The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description that is manifested by the medical findings in paragraph A."

*Id.* at § 12.00(A).
[26]   The ALJ defined a marked limitation as "more than moderate but less than extreme." (Admin. R. at 16).
    The ALJ defined repeated episodes of decompensation, each of extended duration as "three episodes within one year, or an average of once every four months, each lasting for at least 2 weeks." (Admin. R. at 16); *see also* 20 C.F.R. 404, app. 1, § 12.00(C)(4).
[27]   Activities of daily living are defined as

adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using the post office. In the context of your overall situation, we assess the quality of these activities by

ALJ explained that Flint needed daily reminders to take her medication, she did not prepare meals on a daily basis because it hurt to stand and she messed things up, she did not go outside by herself because she felt overwhelmed, and had difficulty with personal care.  (*Id.*).

Flint had moderate difficulties in social functioning because she "previously endorsed symptoms associated with anxiety or panic disorders, particularly in stressful situations involving others." [28]   (*Id.*).   Nonetheless, Flint talked with her boyfriend and son daily, visited her friends and siblings, and had no problem getting along with people.  (*Id.*).  The ALJ also mentioned that Flint's anxiety improved with controlled breathing techniques.  (*Id.*).

Flint had moderate difficulties in concentration, persistence, or pace because Flint "ha[d] some difficulty in sustaining focus, attention, and concentration."[29]  (*Id.*).  The ALJ noted that

---

their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

20 C.F.R. 404, app. 1, § 12.00(C)(1).

[28]      Social functioning is defined as

your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

20 C.F.R. 404, app. 1, § 12.00(C)(2).

[29]      Concentration, persistence or pace is defined as

Flint testified as to her difficulty completing tasks, concentrating, understanding, remembering, and following both written and spoken instructions.  (*Id.*).

Flint experienced no episodes of decompensation of extended duration.[30]  (*Id.* at 16–17).

Because the ALJ did not find Flint's mental impairments caused at least two marked limitations or a marked limitation and repeated episodes of decompensation of extended duration, he found "Paragraph B" criteria were not satisfied.  (*Id.* at 17).  As such, the ALJ went on to consider whether "Paragraph C" criteria were satisfied.[31]  (*Id.*).  The ALJ determined that "the evidence fail[ed] to establish the presence of the "paragraph C" criteria."  (*Id.*).

---

the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.  Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings.  In addition, major limitations in this area can often be assessed through clinical examination or psychological testing.  Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

20 C.F.R. 404, app. 1, § 12.00(C)(3).

[30]     Episodes of decompensation are defined as

exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. 404, app. 1, § 12.00(C)(4).

[31]     Paragraph C criteria "assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities. . . ."  20 C.F.R. 404, app. 1, § 12.00(A).

Next, the ALJ determined Flint had the residual functional capacity ("RFC")

> to perform light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.967(b) except [Flint] is limited to only occasional overhead reaching with the right upper extremity and can frequently engage in gross and fine manipulation with the right upper extremity[, and] is limited to simple, routine and repetitive tasks, which require only occasional interaction with the public and co-workers.

(*Id*.).   To make the RFC determination, the ALJ considered objective medical and opinion evidence as well as Flint's symptoms that could reasonably be accepted as consistent with such evidence.  (*Id*.).

The ALJ applied the requisite two-step test for considering Flint's symptoms.   (*Id*.). First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce [Flint's] pain or other symptoms."   (*Id*.).   Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [Flint's] functioning."  (*Id*. at 18).   When "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must determine the credibility of the statements based on the entire record.  (*Id.*).

Following the above process, the ALJ found that Flint's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]."  (*Id*. at 20).   The ALJ noted that Flint testified about her physical and mental health symptoms, particularly that she had pain in her legs, right hand, and right shoulder; she could not stand for long periods of time; repeated use of her right hand causes numbness and pain radiating into her shoulder; her physical limitations caused anxiety and depression; she had panic and crying spells; some days she did not get out of

bed or dress; and she did not like to be alone or leave the house.  (*Id*. at 18).

The ALJ highlighted the following objective physical medical evidence to support his determination.  A July 2009 a stress echocardiogram and Doppler for hypertension showed normal functioning.  (*Id*.).  In July 2010, Flint was diagnosed with fibromyalgia.  (*Id*.).  In October 2010, Flint presented to Dr. Johnson for a physical consultative examination and complained of high blood pressure, thyroid problems, and fibromyalgia, stating that she hurt all over.  (*Id*.).  Dr. Johnson found Flint's blood pressure within normal limits, that she could walk without the use of an assistive device, had normal range of motion in her joints and knees, had full use of her hands, and had no signs of inflammatory joint disease.  (*Id*.).  In June 2011, Flint had an x-ray of her right scapula shoulder region taken, which showed no scapular fracture, normal alignment, and mild degenerative changes.  (*Id*.).  In December 2011, Winans's notes stated that a shoulder x-ray was taken but showed no rotator cuff symptoms.  (*Id*.).  In January 2012, after complaining of soreness and weakness in both of her hands, Flint underwent a physical examination, which revealed no swelling or tenderness in her hands; no cyanosis, clubbing, or edema; normal peripheral pulses and joints; and no varicose veins.  (*Id*.).  The ALJ further explained Flint self-reported that she was "doing better overall," still had neck and upper trapezius pain, difficulty with cervical mobility, and difficulty driving, but physical findings showed good thoracic mobility and significantly less right scapular muscle tension.[32]  (*Id*. at 18–19).

The ALJ highlighted the following objective mental medical evidence to support his determination.  At the August 2010 mental status examination Dr. Trulsen reported Flint had adequate general memory skills with abstract thought skills developed to expected levels.  (*Id*. at

---

[32]     Thoracic refers to the "upper part of the trunk between the neck and the abdomen . . . ." *Stedman's Medical Dictionary*, Thorax (27th Ed. 2000).

19).  Dr. Trulsen noted that Flint's mental impairment was rated a 55 on the GAF scale, which evidenced moderate symptoms.[33]  (*Id.*).  Dr. Trulsen diagnosed Flint with mixed anxiety and depressed mood, fibromyalgia, and panic disorder with agoraphobia, but noted that Flint's mental capacity for understanding, remembering, and following instructions and sustaining concentration and attention appeared adequately developed and showed no general impairment. (*Id.*).  In November 2010, Dr. Fleming's notes showed that Flint was mildly depressed, but still exhibited a full range of affect, coherent thought process, and demonstrated a good capacity to sustain attention.  (*Id.*).  Flint made progress under Dr. Fleming's care, Flint was more assertive, was able to go places alone without having a panic attack, was able to use breathing techniques to relax and manage anxiety, and was able to restructure maladaptive coping thoughts to modify her mood and behavior.  (*Id.*).

The ALJ did not doubt that Flint experienced some discomfort.  (*Id.*).  The absence of more aggressive treatment; her continued smoking habit; her unpersuasive appearance and demeanor at the hearing; her noncompliance in taking prescribed medications and following her diet and exercise regimen; her failing to attend physical therapy; and her claims of being far less active at the hearing than what was noted in the record, however, supported the conclusion that Flint's allegations were not fully credible.  (*Id.* at 19–20).

Regarding the opinion evidence, the ALJ considered the following opinions and afforded them varying degrees of weight.  The ALJ gave "great weight" to Dr. Trulsen's opinion that Flint's mental capacity to carry out work-like tasks with persistence or pace, her ability to respond appropriately to contact with co-workers and supervisors, and her ability to tolerate

---

[33]    The ALJ defined GAF as "a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. . . ."  (Admin. R. at 19).

entry-level workplace stress may demonstrate occasional slight impairment, but would not preclude employment. (*Id.* at 20). Dr. Trulsen concluded that Flint's daily activities, her ability to complete responsibilities, and her previous employment suggested Flint was capable of workplace functioning. (*Id.*). The ALJ found Dr. Trulsen's opinion was supported by the substantial weight of the evidence. (*Id.*).

The ALJ gave "substantial weight" to Dr. Grant's opinion that Flint was capable of sitting, standing and/or walking six hours in an eight-hour workday, and lifting and/or carrying twenty pounds occasionally and ten pounds frequently. (*Id.*). The ALJ further noted this opinion was generally consistent with his RFC determination. (*Id.*).

The ALJ gave "little weight" to the opinions of Dr. Nelsen, the State Agency psychological consultant.[34] (*Id.* at 21). Dr. Nelsen concluded that Flint's mental capacity for understanding, remembering, and following instructions appeared adequately developed, showed no general impairment, and that Flint's mental impairments were non-severe. (*Id.*). The ALJ found that the opinion did not adequately consider the objective medical evidence or Flint's testimony. (*Id.*).

The ALJ gave "little weight" to Dr. Fleming's opinion that Flint was "likely to be absent from work more than three days per month[, and was] . . . moderately to markedly limited in her ability to complete a normal workday without interruptions from psychologically based symptoms and in her ability to tolerate normal levels of stress." (*Id.*). Dr. Fleming found Flint had agoraphobia that limited her ability to leave the home without extreme distress and discomfort and would interfere with competitive employment. (*Id.*). Because the ALJ found Dr. Fleming's course of treatment was inconsistent with the noted limitations, and Dr. Fleming's

---

[34]     The ALJ incorrectly referred to Dr. Nelsen as Dr. Owen. (Admin. R. at 21, 315).

opinion was inconsistent both internally and with the medical evidence, her opinion merited little weight.  (*Id*.).

The ALJ noted that he gave no weight to the statements of Flint's boyfriend, Mr. John Kmiech ("Kmiech") that Flint did not handle stress well and was isolative.  (*Id*.).  The ALJ pointed out that while Kmiech had the ability to observe and interact with Flint over an extended period of time on a regular basis, he "[did] not have the training or expertise necessary to justify relying on [his] statements."  (*Id*.).

After evaluating Flint's alleged symptoms, the medical and mental record, and opinion evidence, the ALJ determined that the RFC was supported by the record evidence, the treatment notes did not sustain Flint's allegations of disabling symptoms, and Flint's credibility was weakened by inconsistencies in her statements rendering the information unreliable.  (*Id*.).  The ALJ determined that while Flint does have some limitations, she was only limited to the extent consistent with RFC.  (*Id*.).

At step four, the ALJ determined based on Flint's RFC, that she was capable of performing past relevant work as a housekeeping cleaner, assembler, and wreath maker.  (*Id*.).  The ALJ noted that Flint's past jobs did not exceed the exertional level of her RFC because all of Flint's past work was performed at the light level and none exceeded the RFC's limitations.  (*Id*. at 22).  The ALJ relied on the VE's testimony to determine Flint could perform past work as actually and generally performed.  (*Id*.).

At step five, the ALJ concluded that there are other jobs existing in the national economy that Flint is able to perform considering her age, education, work experience, and RFC.  (*Id*.).  Therefore, the ALJ found that Flint was not disabled under 20 C.F.R. §404.1520(g).  (*Id*.).  The ALJ again relied on the VE's testimony in making this determination.  (*Id*. at 23).  The ALJ,

therefore, concluded Flint was not disabled.  (*Id.* at 23–24).

## II.    STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

### A.    Administrative Record

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review.  20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic. *Id.* §§ 404.967–.982, 416.1467.  If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §405(g); 20 C.F.R. §§ 404.981, 416.1481.

### B.     Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. §405(g).  The Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A Court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence."  *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.*  (quoting *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987)).

In reviewing the ALJ's decision, the Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the

claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. §404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate [residual functional capability] remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on the record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

Flint raises multiple arguments in support of her Motion for Summary Judgment. First, she argues that the ALJ erred in the weight he afforded to the opinions of physicians in the record. (Flint's Mem. in Supp. of Mot. for Summary J., "Flint's Mem. in Supp.") [Doc. No. 16 at 6, 18–21]. Second, Flint argues the ALJ incorrectly found her subjective complaints not credible to the extent they were inconsistent with the RFC. (*Id.* at 8–18). Third, Flint argues the ALJ erred by failing to include Flint's moderate difficulties in maintaining concentration,

persistence, and pace in his hypothetical question to the VE.  (*Id.* at 15–18).

A.     **RFC Determination**

1.     **Weight Afforded to Medical Opinions**

Flint argues the ALJ erred in the weight he afforded the opinions of multiple physicians, both treating and non-treating.  (*Id.* at 18–21).

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding.  20 C.F.R. § 404.1527(c)(2).  In fact, when supported by proper medical testing, and not inconsistent with other substantial evidence on record, the ALJ will give such opinion controlling weight.  *Id.*  "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)).

Treating physician's opinions are to be given no weight when they address "questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work[.]"  *Ahlstrom v. Astrue*, No. 08-CV-5768 (RHK/RLE), 2010 WL 147880, at *23 (D. Minn. Jan. 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.  An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered . . . ."  *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (internal citations omitted).

When deciding what weight to afford to any medical opinion, an ALJ considers the following factors:

(1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Leach v. Astrue*, No. 10-CV-4279 (SRN/JSM), 2011 WL 7468635, at *17 (D. Minn. Aug. 5, 2011) *report and recommendation adopted*, 2012 WL 760772 (Mar. 8, 2012) *aff'd*, 496 F. App'x 681 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d); *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007)).

### a.    Dr. Fleming

Flint argues that the ALJ erred in finding the opinion of Dr. Fleming, Flint's treating physician, was entitled to little weight.  (Flint's Mem. in Supp. at 19–21).

Here, the ALJ determined Dr. Fleming's opinion was entitled to little weight because he found Dr. Fleming's prescribed course of treatment inconsistent with Flint's noted limitations, Dr. Fleming's own report was internally inconsistent, and Dr. Fleming's report was inconsistent with other medical evidence in the record.[35]   (Admin. R. at 21).  Flint argues the ALJ failed to explain his assertions of inconsistency in Dr. Fleming's opinion and that the ALJ's statements were conclusory and vague.  (Flint's Mem. in Supp. at 19–21).  Flint also argues the ALJ's failure to cite specific examples makes "it impossible for any reviewing party to determine whether or not the ALJ's rejection of [Dr. Fleming's] opinion was proper."  (*Id.* at 21).

Contrary to Flint's suggestion, the ALJ did not err in finding Dr. Fleming's opinion was entitled to little weight because the record supports his findings of inconsistency.  *See Martise v. Astrue*, 641 F.3d 909, 925–26 (8th Cir. 2011) (rejecting claimant's argument that the ALJ's

---

[35]    The opinion at issue is found at pages 352 to 354 of the Administrative Record.

failure to cite specific medical evidence contradicting the opinion of a treating physician rendered the ALJ's decision erroneous because there was support in the record for his conclusion); *see also Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir.1999) (treating physician's opinion "is afforded less deference when the medical evidence in the record as a whole contradicts the opinion itself.").

First, record evidence supports the ALJ's determination that Dr. Fleming's opinion that Flint was likely to be absent from work more than three days a month and was moderately to markedly limited in her ability to complete a normal workday and tolerate normal levels of stress was inconsistent with Flint's course of treatment and other of Dr. Fleming's appointment notes, evidencing improvement in Flint's condition.  The ALJ explained that treatment generally was effective in controlling Flint's mental conditions as Flint explained she felt much better while taking Prozac; Flint experienced uncontrolled depression when not compliant with her prescribed Cymbalta.  *See Green v. Astrue*, 390 F. App'x 620, 622 (8th Cir. 2010) (citing *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)) ("[Claimant] reported improvement of her mental health subsequent to medication changes, which the ALJ appropriately considered.")); (Admin. R. at 20).

Further, Dr. Fleming's treatment notes reported Flint's mental condition had been improving.  For example, the ALJ cited Dr. Fleming's treatment notes from November 2010, which stated Flint had made progress during treatment and was able to better deal with her mental conditions.  (*Id.* at 19).  In addition, during her treatment of Flint, Dr. Fleming started noting improvements in Flint's mental condition in November 2010, after Flint had multiple appointments with Dr. Fleming, and those improvements continued throughout Flint's treatment with Dr. Fleming.  *See* (*id.* at 337–46, 378–79, 409, 420, 434–35, 437).

34

Second, record evidence also supports the ALJ's determination that Dr. Fleming's opinion concerning Flint's projected absence from work and ability to function in a work setting was inconsistent with other medical evidence. For example, other physicians also noted improvement in Flint's mental status and included Flint's own self-reports of improvement. *See* (*id.* at 383, 571–73). In addition, Flint's mental status examinations showed unremarkable results including appearing alert and oriented, having normal moods, thoughts, speech patterns, memory, attention span, and judgment. *See, e.g.*, (*id.* at 250, 267–68, 277, 282–85, 303–05, 341–44, 389, 395, 411). Because there is substantial evidence in the record supporting inconsistencies between Dr. Fleming's opinion and other record evidence, the Court finds the ALJ provided appropriate weight to Dr. Fleming's opinion. *See, e.g.*, *Wildman*, 596 F.3d at 964.

### b.      Dr. Johnson

Flint argues the ALJ erred because he never explicitly assigned a weight to the opinion of the consultative examiner, Dr. Johnson. (Flint's Mem. in Supp. at 5–6). Specifically, Flint argues "[t]he ALJ did not report or explain how Dr. Johnson's observations of noticeable pain and difficulty ambulating supported his findings that [Flint] can stand and walk most of the day and **never** explicitly assigned weight to Dr. Johnson's opinion." (*Id.* at 6) (emphasis in original).

A medical opinion is defined as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect[s] judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); *Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004)). On the other hand, treatment notes that "reflect the clinicians' observations of [the claimant's] symptoms, the nature of [the claimant's] impairments, and the clinicians'

diagnoses" but do not "indicate any prognoses, nor do they provide opinions as to what [the claimant] could still do despite her impairments . . ." do not qualify as medical opinions. *McDonald v. Astrue*, 492 F. App'x 875, 884 (10th Cir. 2012).

The ALJ discussed Dr. Johnson's findings as medical evidence, but did not discuss them as a medical opinion.  *See* (Admin. R. at 18–19).  Dr. Johnson's notes repeated what Flint described as her symptoms, included a few of his observations, and reported results of range of motion studies and other tests.  (*Id.* at 307–11).  Dr. Johnson did not provide any explanation about what work-related activities Flint could still perform with her impairments.  *See* (*id.*). Because Dr. Johnson's treatment notes do not include his prognosis or opinion as to what Flint can still do despite her impairments, Dr. Johnson's treatment notes do not constitute a medical opinion.  *See* (*id.*).  Thus, the ALJ did not err in considering Dr. Johnson's notes as medical evidence and not as a medical opinion in reaching his RFC determination.

### c.    Dr. Grant[36]

Flint argues the ALJ erred in affording great weight to the opinion of Dr. Grant, a non-examining physician.  (Flint's Mem. in Supp. at 18–19).

Here, the ALJ provided substantial weight to the opinion of State Agency consultant Dr. Grant, who opined that Flint was capable of sitting, standing and/or walking six hours in an eight-hour workday, and lifting and/or carrying twenty pounds occasionally and ten pounds frequently.  (Admin. R. at 20).  Flint argues that the ALJ inappropriately provided substantial weight to Dr. Grant, a non-examining physician whose opinion cannot constitute substantial evidence in determining an RFC.  (Flint's Mem. in Supp. at 18).

---

[36]    Flint misstates Dr. Grant as Dr. Charles, as the ALJ did as well.  (Flint's Mem. in Supp. at 18–19); (Admin. R. at 20).  The Court, however, finds Flint meant Dr. Grant because Flint cites to opinions completed by Dr. Charles Grant.  *See* (Flint's Mem. in Supp. at 18–19); (Admin. R. at 20, 329–336)

Despite stating that he was giving substantial weight to Dr. Grant's opinion, the ALJ also stated that he considered the objective medical evidence, opinion evidence, and all of Flint's symptoms to the extent they were consistent with the objective evidence in determining Flint's RFC.  (Admin. R. at 17).  Based on the Court's review, nothing suggests that the ALJ did not consider all of the evidence in making his RFC determination.

Also, Flint argues that the ALJ incorrectly stated that Dr. Grant based his opinion on a review of the entire record when the record actually contains over two hundred pages of medical evidence dated after Dr. Grant conducted his review in October 2010.  (Flint's Mem. in Supp. at 18–19).

When the opinion of a non-treating physician is based on a limited record and the rest of the record does not evidence any substantial differences or changes and the findings were consistent with the weight of the objective evidence, the ALJ can still provide weight to the opinion.  *See Claussen v. Astrue*, No. 10-CV-4258 (JNE/FLN), 2011 WL 6987174, at *11 (D. Minn. Dec. 20, 2011) *report and recommendation adopted*, 2012 WL 87534 (Jan. 11, 2012) (holding that the opinion of a state agency physician based on a limited record is entitled to some probative weight when "the limited record reviewed was not substantially different from the other medical evidence available, and his findings were consistent with the weight of the objective medical evidence.").  Moreover, to the extent Flint argues the fact that Dr. Grant reviewed a limited record shows that the ALJ incorrectly afforded substantial weight to Dr. Grant's opinion, Flint's argument is essentially undeveloped.  *See* (Flint's Mem. in Supp. at 18–19).  In fact, Flint only cites one such piece of medical evidence.  *See* (*id.*).  The only specific piece of evidence arising after Dr. Grant's review that Flint cites is Dr. Fleming's medical opinions.  *See* (*id.*).  Notably, however, Dr. Fleming treated Flint's mental impairments;

therefore, Dr. Fleming's opinions cannot undermine Dr. Grant's opinions concerning Flint's physical impairments.  Because Flint does not provide any substantiation of or support for this argument beyond citing to a medical opinion from Dr. Fleming, it is waived.  *See Ollila v. Astrue*, No. 09-CV-3394 (JNE/AJB), 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) *report and recommendation adopted*, 2011 WL 589588 (Feb. 10, 2011) (citations omitted).  It is not the Court's duty to comb through the over two hundred pages of medical records dated after October 2010 in an attempt to support Flint's argument.  *See Binion v. City of St. Paul*, 788 F. Supp. 2d 935, 950 (D. Minn. 2011) (PJS/AJB).

The Court, thus, finds the ALJ did not err in affording great weight to Dr. Grant's opinion.

### 2.     Credibility Determination

Flint argues the ALJ erred in finding Flint was not fully credible.  (Flint's Mem. in Supp. at 8–15).

In the Eighth Circuit, *Polaski v. Heckler* provides the governing factors for a credibility determination.  739 F.2d 1320, 1322 (8th Cir. 1984).   In assessing subjective complaints of pain, an ALJ must consider several factors including:   "(1) the claimant's daily activities;  (2) the duration, frequency[,] and intensity of pain;  (3) dosage, effectiveness, and side effects of medication;  (4) precipitating and aggravating factors;  and (5) functional restrictions."  *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322).   Other relevant factors are the claimant's work history and objective medical evidence.  *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).   "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the

claimant's credibility." *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)).

An ALJ finding a claimant not to be credible must provide reasons for discrediting the claimant and document the inconsistences uncovered. *Bakke v. Colvin*, No. 12-CV-538 (JNE/TNL), 2013 WL 4436178, at *5 (D. Minn. Aug. 16, 2013) (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); SSR 96-7, 1996 WL 374186, at *2 (July 2, 1996). An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole. *Casey*, 503 F.3d at 695 (citing *Polaski*, 739 F.2d at 1322). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court defers to an ALJ's decisions on credibility. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). The ALJ cannot only rely on the lack of objective medical evidence fully supporting subjective complaints of pain in making the credibility determination. *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

Here, the ALJ provided multiple reasons for his determination that Flint was not fully credible. First, the ALJ cited the absence of more aggressive treatment as a reason she was not fully credible. (Admin. R. at 19). Flint argues that the ALJ incorrectly used the absence of more aggressive treatment as a reason to discount her credibility. (Flint's Mem. in Supp. at 9–11). Flint argues this was error because it represents a mischaracterization of Flint's pain treatment program. (*Id.*). Flint argues the ALJ utilized only medical records that supported his decision and failed to cite others that supported Flint's allegations of disabling impairment. (*Id.*).

Conservative treatment and failure to undergo more aggressive treatment, including surgery, however, has been used to discredit a claimant's subjective complaints of pain at the Eighth Circuit. *See Moore v. Astrue*, 572 F.3d 520, 524–25 (8th Cir. 2009); *Black*, 143 F.3d at 386; *Johnson v. Chater*, 108 F.3d 942, 947 (8th Cir. 1997); *Robinson v. Sullivan*, 956 F.2d 836, 840 (8th Cir. 1992).   The Eighth Circuit has also deemed pain management conservative treatment.   *Gowell v. Apfel*, 242 F.3d 793, 795 (8th Cir. 2001) ("[Claimant's] doctors have primarily ordered conservative treatment, such as physical therapy, **pain management**, and psychological treatment.") (emphasis added).   Therefore, the ALJ did not err in considering the absence of more aggressive treatment as a reason discounting Flint's credibility.

Second, the ALJ cited Flint's non-compliance with treatment as a reason she was not fully credible.   (Admin. R. at 19–20).   The ALJ explained that despite her poorly controlled blood pressure and doctors' strong encouragement that she stop smoking, Flint continued to smoke.   (*Id.* at 19).   Flint argues this was misleading because the ALJ failed to explain that in the same medical record Flint asked for a referral to the QuitPlan to assist her in smoking cessation. (Flint's Mem. in Supp. at 11–12).

Any error by the ALJ in considering Flint's failure to stop smoking is harmless because the ALJ relied on multiple factors in making his credibility decision and Flint did not show that the ALJ would have reached a different result without the alleged error of considering Flint's failure to stop smoking. *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) (citing *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)) (explaining that an error is harmless if there is no indication that the ALJ would have reached a different decision without the alleged error); *Peka v. Colvin*, No. 12-CV-1593 (MJD/FLN), 2013 WL 4436180, at *10 (D. Minn. Aug. 16, 2013) (citation omitted) (explaining that the claimant has the burden of showing that the ALJ's failure

to consider or give the proper weight to the medical opinions of the treating physicians was not harmless).

The ALJ also noted that Flint had not been fully compliant in taking her prescribed medications, suggesting that her symptoms were not as limiting as she alleged. (Admin. R. at 20). Specifically, the ALJ noted that although she complained of uncontrolled depression, Flint was not taking her prescribed Cymbalta. (*Id.*). Flint argues that the medication in issue at the pages cited by the ALJ was actually Prozac and Flint reported a fear of death if she took Prozac. (Flint's Mem. in Supp. at 13). Flint further argues that the ALJ had a duty to discuss Flint's reasons for not taking her medication, but he failed to do so. (*Id.*). Flint argues that her mental impairment was a justifiable excuse for her not taking her medication. (*Id.* at 13–14).

Flint is correct that Prozac is discussed at the pages cited by the ALJ, but she fails to acknowledge that Cymbalta is also discussed. *See* (Admin. R. at 386, 392–93). The cited records show that Flint reported a history of uncontrolled depression but that she only took Cymbalta on rare occasion and that she had stopped taking Cymbalta for a week. (*Id.* at 392–93).

> Social Security Ruling 82–59 lists the circumstances under which "an individual's failure to follow prescribed treatment will be generally accepted as 'justifiable' and, therefore, such 'failure' would not preclude a finding of 'disability.'" Although none of the listed circumstances pertain to mental illness, federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the "result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse."

*Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (internal citations omitted). "Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of 'the rationality to decide whether to continue treatment or medication.'" *Id.* at 945–46. The

41

record in *Pate-Fires* included "overwhelming evidence . . . expressly indicating that the claimant's severe mental disorder caused her noncompliance with psychiatric medication . . . ." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). That is not the case here. Flint testified Cymbalta did not work because it made her sick. (Admin. R. at 47); *see also* (*id.* at 417) (noting that Cymbalta helped Flint but if side effects persisted then the prescribing doctor might consider changing the medication; no side effects were listed specifically). In other places in the record, however, Flint reported she had no side effects from Cymbalta. (*Id.* at 236, 436). In addition, the record shows that Cymbalta actually helped Flint. (*Id.* at 417, 436, 447). Flint, thus, has not shown that her failure to take Cymbalta was due to her mental impairments. Therefore, any error in the ALJ's failure to consider the reason Flint discontinued Cymbalta is harmless. *See Byes*, 687 F.3d at 917; *Peka*, 2013 WL 4436180, at *10.

The ALJ also noted that although Flint was largely compliant with the PMP, she failed to comply with other parts of her treatment including her physical therapy, diet, and exercise. (Admin. R. at 20). The ALJ specifically explained that Flint was seen for eighteen physical therapy sessions but then decided to take a break; Flint had not been seen for physical therapy since July 2011. (*Id.*). Flint argues that although the record contains a reference to her noncompliance with her diet and exercise with respect to hypertension not physical therapy, the record contains no evidence that she failed to comply with her physical therapy. (Flint's Mem. in Supp. at 14–15). Flint argues that the ALJ cites in support of his proposition that Flint took a break from physical therapy a record that actually notes Flint took a break from mental health therapy when her therapist, Dr. Fleming, went on maternity leave. (*Id.*).

"[A] failure to follow prescribed medical treatment without good cause is a basis for denying benefits." *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *see also Scholtes v.*

*Astrue*, No. 07-CV-2604 (DWF/FLN), 2008 WL 2414334, at *13–14 (D. Minn. June 11, 2008) (affording reduced weight to the opinion of one of the claimant's treating physicians when the claimant's condition was, *inter alia*, treated conservatively and claimant did not follow physicians' recommendations). Despite Flint's argument that there is no record evidencing her discharge from physical therapy, on July 25, 2011, O'Connor, Flint's physical therapist, wrote "[a]ttendance and participation not sufficient to achieve goals. Patient did not return to PT and is discharged." (Admin. R. at 396). Flint offers no good cause for her failures to comply with her treatment, therefore, the ALJ's consideration of Flint's failure to comply with diet, exercise, and physical therapy in the credibility analysis was justified.

Third, the ALJ cited Flint's demeanor at the hearing as inconsistent with her testimony, making Flint not fully credible. (Admin. R. at 19–20). The ALJ explained that Flint was able to sit through the entire hearing without getting up because of discomfort, but he emphasized that this was only one factor in the ultimate credibility decision. (*Id.*). Flint argues that the ALJ is essentially using a "sit and squirm test" and the ALJ cannot use this as a basis for finding Flint not fully credible. (Flint's Mem. in Supp. at 12).

Flint is correct that the ALJ cannot use personal observations of a claimant during a hearing as the **sole** basis for rejecting the claimant's testimony. *See Reinhart v. Sec'y of Health & Human Servs.*, 733 F.2d 571, 573 (8th Cir. 1984). However, the ALJ can employ personal observations of a claimant during the hearing as a **factor** in the credibility analysis. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (citing *Johnson v. Apfel*, 240 F.3d 1145, 1147–48 (8th Cir. 2001)). The ALJ, thus, did not err in his consideration of Flint's demeanor at the hearing as a factor in his ultimate credibility decision.

Flint then argues that her ability to sit during the hearing was actually consistent with her testimony describing her difficulties with stairs, standing, and carrying laundry, and her current argument that she is limited to sedentary work.   (Flint's Mem. in Supp. at 12).   The Court, however, notes that Flint actually testified that she could not sit "for any length of time" at the hearing and reported that her ability to sit was affected by her impairments in her Function Report.   (Admin. R. at 52, 219).   Therefore, the Court does not find persuasive Flint's argument that her demeanor supported her credibility.

Fourth, the ALJ explained that Flint's testimony painted a picture of her as far less active than her activity level described in the record.   (Admin. R. at 20).   Specifically, the ALJ explained that Flint claimed to be far less active in her testimony at the hearing than what the record showed.   (*Id.*).   Flint does not explicitly challenge this finding.   *See* (Flint's Mem. in Supp.).

Fifth, the ALJ explained that generally treatment had been successful in controlling Flint's symptoms.   (Admin. R. at 20).   The ALJ specifically cited to record evidence that while taking Prozac, Flint felt much better.   (*Id.*).   Flint does not challenge this finding.   *See* (Flint's Mem. in Supp.).

To the extent Flint argues the ALJ's credibility analysis did not satisfy *Polaski* because it did not consider all of the *Polaski* factors, her argument fails.   (Flint's Mem. in Supp. at 9).   "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility."   *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). The failure to address each *Polaski* factor separately does not render the ALJ's determination invalid.   *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000); *Hicks v. Astrue*, No. 10-CV-2930

(DWF/AJB), 2011 WL 3206960, at *11 (D. Minn. May 31, 2011) *report and recommendation adopted*, 2011 WL 3207049 (July 28, 2011).

In addition, to the extent Flint argues Dr. Johnson's records support her subjective complaints, this argument fails as the Court's review determines whether there was substantial evidence in the record as a whole to support the ALJ's decision.  (Flint's Mem. in Supp. at 6).  It is not the Court's job to reweigh the evidence.  Here, even if, as Flint asserts, her subjective complaints are supported by Dr. Johnson's findings that is not enough to overcome the other substantial evidence that supported the ALJ's finding that Flint was not fully credible.

Thus, the ALJ's determination that Flint was not fully credible was adequately supported by substantial evidence in the record.

### B.      Hypothetical Question

Flint asserts that substantial evidence does not support the ALJ's reliance on the VE's testimony in response to the hypothetical.  (Flint's Mem. in Supp. at 15–16).

"In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."  *Gilbert v. Apfel*, 175 F.3d 602, 604 (8th Cir. 1999).  The hypothetical must "capture[] the concrete consequences of a claimant's deficiencies" to constitute substantial evidence.  *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997).  "'[T]he ALJ is only required to incorporate into the hypothetical those impairments and limitations which have been accepted as credible.'"  *Gorton v. Astrue*, No. 06-CV-4903 (PJS/JSM), 2008 WL 583703, at *29 (D. Minn. Feb. 28, 2008) (quoting *Daniel v. Barnhart*, No. 01-CV-852 (JRT/ALB), 2002 WL 31045847, at *4 (D. Minn. Sept. 10, 2002)).

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question.  When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence.  Thus, the ALJ's hypothetical

question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996) (internal citations omitted).

The ALJ asked the following hypothetical question to the VE:

> Please assume an individual who was capable of performing light work. This hypothetical individual could occasionally engage in overhead reaching with the right [upper] extremity . . . and . . . frequently engage in gross and fine manipulation with the right upper extremity. The hypothetical individual would be limited to simple, routine, and repetitive tasks which require only occasional interaction with the public and only occasional interaction with co-workers. Considering this first hypothetical, would the hypothetical individual be capable of performing any of the past work that you identified?

(Admin. R. at 64–65). Subsequent hypothetical questions assumed the same limitations as this hypothetical and added an additional limitation. (*Id.* at 64–69).

Flint also argues the ALJ erred in his hypothetical by failing to include his finding that Flint was moderately limited in her ability to maintain concentration, persistence, and pace. (Flint's Mem. in Supp. at 15–18). Specifically, Flint asserts that the ALJ's limitation of Flint to "simple, routine, and repetitive tasks which require only occasional interaction with the public and coworkers" does not satisfy applicable policy or precedent. (*Id.* at 15) (footnote omitted).

The ALJ found Flint had moderate limitations in concentration, persistence, and pace in his Paragraph B analysis. (*Id.* at 16). The ALJ explained that

> [t]he evidence in the record, including the testimony of the claimant at the hearing, shows that the claimant has some difficulty in sustaining focus, attention and concentration. The claimant reported that she has difficulty completing tasks, concentrating, understanding, and following instructions as well as her memory. She stated that she does not finish what she starts and has problems following both written and spoken instructions.

(*Id.*) (internal citations omitted). The ALJ, however, explicitly stated "[t]he limitations identified in the "paragraph B" criteria are not [an] [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process," and the mental RFC

required "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B . . . ." (*Id.* at 17).

The Eighth Circuit addressed a similar issue in *Newton v. Chater*, where the

> ALJ stated on the Psychiatric Review Technique Form that the claimant "often" had deficiencies of concentration, persistence, or pace, but the hypothetical presented to the vocational expert merely limited the claimant's capabilities to simple jobs. The hypothetical did not specifically include impairments regarding concentration, persistence, or pace. We held that the reference to simple jobs in the hypothetical was not enough to constitute inclusion of such impairments.

*Brachtel v. Apfel*, 132 F.3d 417, 421 (8th Cir. 1997) (citing *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996) (internal citations omitted).

*Newton* is distinguishable here because the ALJ did not find that Flint "often" had deficiencies in concentration, persistence or pace, as the ALJ made his findings that Flint was moderately limited in concentration, persistence, and pace only for the purposes of assessing the severity of Flint's mental illness under "Paragraph B" **not** for the purposes of the RFC assessment.  (Admin. R. at 17); *see also Daniels v. Astrue*, No. 12-CV-407 (PAM/AJB), 2013 WL 1339350, at *15 (D. Minn. Feb. 6, 2013) *report and recommendation adopted*, 2013 WL 1329028 (Apr. 1, 2013)  The ALJ explained that he would make a more detailed analysis when making his mental RFC determination in the sequential evaluation process.  (Admin. R. at 17). In addition, the record does not support a finding that Flint was so limited.  The record actually suggested Flint's concentration, persistence, and pace issues were relatively mild.  Consultative examiner, Dr. Trulsen explained Flint's

> general mental capacity for understanding, remembering, and following instructions, sustaining attention, and concentrating all appeared adequately developed and showed no general impairment.  [Flint's] general mental capacity for carrying out work-like tasks with reasonable persistence or pace . . . may demonstrate occasions of slight impairment per her current report of mental health symptoms, however, this would not appear to prevent her from being effective in applying her skills in these areas.

(*Id.* at 305).  The ALJ gave this opinion great weight, and the Court has already determined the ALJ did not err in affording such weight.  (*Id.* at 20).  Moreover, Flint's treating physician, Dr. Fleming, reported that Flint met her goal of reporting "improved memory and concentration with less sense of distraction or forgetfulness due to pain and fibromyalgia."  (*Id.* at 378).

The ALJ included his RFC finding in the hypothetical question to the VE.  Therefore, it was proper for the ALJ to rely on the VE's testimony, and find Flint was not disabled.  *See Daniels*, 2013 WL 1339350, at *15 (citing *Alvarez v. Astrue,* No. 11–2512, 2012 WL 3441904 at *17–20 (D. Kansas Aug. 14, 2012).

Flint also argues the ALJ erred in not including moderate restrictions in concentration, persistence, and pace in his RFC determination.  (Flint's Mem. in Supp. at 15–18).  This argument also fails as the Court has already explained the ALJ's findings under "Paragraph B" are different than his RFC determination and record evidence does not support that Flint had such limitations in concentration, persistence, and pace. *See* (Admin. R. at 17).  The ALJ's failure to include moderate restrictions in concentration, persistence, or pace in his RFC was not error.

### C.      Grid Guidelines[37]

Flint also argues that she should have been found disabled under applicable Grid guidelines because of her age and exertional limitations.  (Flint's Mem. in Supp. at 5).  Flint's argument hinges on her assertion that she should have been limited to sedentary, not light, work. *See* (*id.*).  Because the Court has already affirmed the ALJ's RFC determination, this argument fails because Flint is not limited to sedentary work.

## IV.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Flint's Motion for Summary Judgment [Doc. No. 15] be **DENIED**;

2.      The Commissioner's Motion for Summary Judgment [Doc. No. 24] be **GRANTED**; and

3.      Judgment be entered and the case be dismissed.


Dated: June 5, 2014

*s/ Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

---

[37]      The medical-vocational guidelines, or grids, are a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability.  The grids come into play at step five of the analysis, where the burden shifts to the Commissioner to show that the claimant has the physical residual capacity to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors such as age, education, and work experience.  If the ALJ's findings as to RFC, age, education, and work experience fit any of the combinations of those criteria contained in the Tables in Appendix 2 to Part 404, then the ALJ must reach the conclusion (either 'disabled' or 'not disabled') directed by the relevant Rule or line of the applicable Table.

*Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (internal citations and quotations omitted).

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of court, and serving all parties by **June 19, 2014**, a writing which specifically identifies those portions of this Report and Recommendation to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.